**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Neil Barnett, M.D., | No. CV-12-2160-PHX-SMM |
| Plaintiff, | |
| v. | **MEMORANDUM OF DECISION AND ORDER** |
| Lincoln National Life Insurance Co., | |
| Defendant. | |
| Lincoln National Life Insurance Co., | |
| Third-Party Plaintiff, | |
| v. | |
| Anthony Michael Rogozinski et al., | |
| Third-Party Defendants. | |

Before the Court is Defendant Lincoln National Life Insurance Company's ("Lincoln") fully briefed Motion for Summary Judgment. (Docs. 46; 50; 55.) For the reasons that follow, the motion is denied.[1]

As a preliminary matter, the separate and controverting statements of fact provided for by Local Rule 56.1 are simply indices to evidence in the record that establish the

---

[1] The request for oral argument is denied because there was adequate opportunity to present written argument and oral argument will not aid the Court's decision. Fed. R. Civ. P. 78(b); LRCiv. 7.2(f); Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

existence or absence of genuine disputes. See Fed. R. Civ. P. 56(c)(1)(A) advisory committee notes (2010). Toward that end, controverting statements may "summarily" state objections but they may not raise "any argument regarding[] the admissibility of evidence," which may only "be presented in the objecting party's responsive or reply memorandum." LRCiv 7.2(m)(2). Allowing objections while prohibiting argument promotes the function of controverting statements as an index to *admissible* evidence while preventing the division of briefs and multiplication of page limits. See Pruett v. Arizona, 606 F. Supp. 2d 1065, 1074 (D. Ariz. 2009) (discussing LRCiv 7.2(m) in context of motions to strike).

Even though Plaintiff Neil Barnett ("Barnett") was granted leave to exceed presumptive page limits, he filed a controverting statement of facts that went beyond summarily stating objections and/or disputing Lincoln's factual assertions with conflicting evidence by raising substantive legal arguments (e.g., Doc. 49 ¶ 48). Consequently, the Court struck the offending filing. (Doc. 52.) Undeterred, Lincoln filed a controverting statement that not only responded to each of the objections and legal arguments in Barnett's stricken controverting statement (Doc. 56 at 2-7), but also raised substantive legal arguments of its own regarding the facts set forth in Barnett's separate statement (e.g., id. at 9 ¶ 14). This is the type of circumvention of page limits that Local Rule 7.2(m) was meant to curtail.

It would be inequitable to penalize Barnett and excuse Lincoln for violating the same rule in virtually the same manner. Accordingly, the Court hereby vacates the part of its Order of January 23, 2014, striking Barnett's controverting statement of facts (Doc. 52 at 2:6-7, 12-14) but will not consider any arguments raised outside of either party's legal memoranda. Both parties are reminded that compliance with the Local and Federal Rules of Civil Procedure is paramount. See LRCiv 83.1(f)(1)(A).

As to the parties' objections themselves, a court ruling on summary judgment may not consider evidence that would be inadmissible at trial. See Miller v. Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir. 2006); see also Bourjaily v. United States, 483 U.S. 171, 175 (1987) (explaining the traditional threshold for admissibility is "a preponderance"). The commentary to the Federal Rules explains:

> a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.

Fed. R. Civ. P. 56(c)(2) advisory committee notes (2010). Like an objection at trial, the objecting party must "state[] the specific ground [therefor], unless it [is] apparent from the context." Fed. R. Evid. 103(a)(1)(B); see Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (finding objection raised in reply memorandum was timely, clear, and specific). In the pretrial setting, however, the focus is not "on the admissibility of the evidence's form," but "on the admissibility of its contents." Fraser, 342 F.3d at 1036.

Barnett mostly raises specific objections (*e.g.* "Plaintiff objects . . . on the basis of hearsay"). (See Doc. 49.) Lincoln's only response to these objections is that they "do not meet the requirements of Rule 56(c)." (Doc. 56 at 2-7.) Lincoln is incorrect—Barnett's objections are timely, clear, and specific. Because Lincoln failed to show its evidence is admissible as presented or would be presented in admissible form at trial, the Court sustains Barnett's objections unless admissibility is readily apparent. See Fraser, 342 F.3d at 1036.

Conversely, Lincoln exclusively raises unspecific objections ("Lincoln National objects . . ."). (See Doc. 56 at 7-16.) The sole context of these objections is legal argument that the Court will not consider because it was impermissibly included in a controverting statement of facts. (Id.) Consequently, Lincoln's objections are not specific enough for the Court to rule upon, and they are overruled unless inadmissibility is self-evident.

## BACKGROUND

The following facts are not the subject of any genuine dispute. In February 1993, Third-Party Defendant Anthony Rogozinski ("Rogozinski") was a general agent for CHUBB Insurance Company. (Docs. 54 ¶¶ 1-3; 56 at 7 ¶ 2.) Barnett was a practicing orthopedic surgeon who was concerned about whether the disability policy he had at the time would provide coverage if he could no longer perform surgery. (Doc. 47 ¶ 8.) Barnett knew Rogozinski was a CHUBB agent and had purchased other CHUBB instruments from Rogozinski in the past. (Doc. 54 ¶¶ 39, 59.) Rogozinski met with Barnett at his home and,

- 3 -

after a conversation that focused mostly on what constituted disability, recommended that a CHUBB policy with an "Own Occupation Rider" and an "Own Occupation Speciality Rider" would give Barnett better and more coverage.[2] (Docs. 47 ¶ 8; 54 ¶¶ 7, 19, 23-24; 59-4 at 10.) Rogozinski only offered CHUBB disability policies. (Docs. 54 ¶ 11; 59-4 at 8-9.)

Barnett's application was approved and when Rogozinski delivered the CHUBB disability policy (the "Policy") to Barnett, the two of them went through the Policy page by page discussing what the Policy terms meant. (Id. ¶ 29.) Pursuant to the "Own Occupation Rider," which purports to "liberalize[] the policy definition of total disability to create the best definition available today," the Policy states in relevant part:

> **Total Disability, or totally disabled** means that due to Injuries or Sickness:
> a. you are not able to perform the substantial and material duties of your occupation; and
> b. you are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement if your physician deems that continued care would be of no benefit to you.
> ***
> **Presumptive Total Disability – Loss of Speech, Hearing, Sight or the Use of Two Limbs –** You will be presumed to have a Total Disability if Injuries or Sickness results in the total loss of:
> . . .
> d. the use of both hands; or
> . . .
> You must present satisfactory proof of loss. Your ability to work will not matter. You will not be required to be under the regular care of a physician. Benefits will be paid according to the Total Disability Provisions of this policy and will start to accrue on the date of loss. But if such loss is permanent and occurs before your 65th birthday, the monthly benefit for Total Disability will be paid as long as you live, regardless of the maximum benefit period.

(Docs. 47 ¶¶ 19-20, 22; 59-11.)

Rogozinski's and Barnett's discussion generally concerned how the "Own Occupation Rider" (Doc. 59-11 at 12) and the "Own Occupation Specialty Rider" applied to benefits. (Doc. 54 ¶ 30.) If Barnett had a question about a Policy term, he would ask Rogozinski how CHUBB would apply the verbiage (id. ¶ 36); the two discussed in detail how the Own

---

[2] While Lincoln did not submit the "Own Occupation Rider" as part of the Policy documents (Docs. 46 at 4; 47 ¶ 19; see 60-1 at 45-58), Barnett submitted a copy (Doc. 59-11 at 12). The Court has not found the "Own Occupation Speciality Rider" in the Parties' summary judgment submissions, but the existence of this document is undisputed.

- 4 -

1  Occupation Rider applied to Presumptive Total Disability (id. ¶ 33). Rogozinski represented
2  that the Rider amended the Policy so that Barnett would be presumed to be totally disabled
3  if he lost the use of both hands for performing the duties of his occupation and
4  specialty—practicing orthopedic surgery. (Id. ¶ 34.) This interpretation of the Presumptive
5  Total Disability term made the Policy more desirable to Barnett than it otherwise would have
6  been. (Id. ¶ 41.) Rogozinski also represented that while the Policy period was until Barnett's
7  65th birthday, the Policy mentioned lifetime benefits because there were circumstances under
8  which Barnett could receive them. (Id. ¶ 42.)

9  Rogozinski told Barnett that he was the local representative for CHUBB, that he spoke
10 for CHUBB in clarifying questions about policy terms, and that he was CHUBB's
11 mouthpiece. (Id. ¶¶ 13-15.) Barnett understood the Policy language was that of CHUBB and
12 that Rogozinski clarified, as opposed to altered, the language; accordingly, Barnett relied on
13 Rogozinski's representations in accepting the Policy. (Id. ¶ 35, 37-39.) After accepting the
14 policy, Barnett paid premiums directly to Rogozinski and Rogozinski was the conduit for
15 most, but not all, of Barnett's communication with CHUBB. (Docs. 54 ¶¶ 16-17, 40; 59-4
16 at 11-12; 56-1 at 14-15.) CHUBB never told Barnett to speak with anyone besides
17 Rogozinski until Rogozinski was no longer associated with CHUBB. (Doc. 54 ¶ 60.)

18 A few years later but before Barnett reached the age of 50, he filed a claim for
19 disability benefits after developing osteoarthritis in his right shoulder. (Id. ¶¶ 43-44.)
20 Consequently, CHUBB paid disability benefits until Jefferson Pilot Life Insurance Company
21 ("Jefferson") took over payments after acquiring CHUBB's disability insurance block of
22 business. (Id. ¶ 45.) Thereafter, Jefferson merged with Lincoln and Lincoln took over
23 payments. (Id. ¶¶ 46-47.) At some point, Barnett gave notice that he was disabled because
24 both shoulders were afflicted. (Docs. 54 ¶ 50; 56 at 14 ¶ 50.)

25 By August 4, 2008, well before his 65th birthday, Barnett informed a Lincoln
26 representative that he was totally disabled and that he was entitled to lifetime benefits under
27 the Policy. (Docs. 54 ¶ 52; 59-8 at 2; 60-1 at 69-70.) The representative responded that
28 Barnett's benefits would expire on his 65th birthday. (Docs. 59-8 at 2; 60-1 at 69-70.) Barnett

replied that if his benefits ended when he turned 65 then Rogozinski misrepresented the terms of the Policy and threatened legal action if it became necessary. (Docs. 47 ¶ 27; 60-1 at 70.) By April 2011, still before he turned 65, Barnett hired attorney an who inquired about the Policy's Total Presumptive Disability Benefits by mail (Docs. 54 ¶ 53; 54-9) and by phone (Docs. 54 ¶ 54; 54-10). Lincoln sent letters to the attorney in June, July, and November 2011 (Docs. 47 ¶¶ 39-41; 60-2 at 48-49, 51, 53), in January and February 2012 (Doc. 60-3 at 2-3, 5-6).[3]

Lincoln took the position that neither Barnett nor his counsel ever provided evidence to support Barnett's claim of total disability.[4] (Doc. 47 ¶ 43.) Barnett took the opposite position that Lincoln had received medical records indicating that Barnett had both shoulders replaced (Doc. 54 ¶ 62) and that Barnett established he lost the use of both his hands for his former profession of practicing orthopedic surgery at least by January 31, 2011, when he filed a claim statement along with an attending physician's statement (id. ¶ 61). Lincoln concedes that Barnett established he was unable to use his hands for surgery before his 65th Birthday (Doc. 56 ¶ 61), that he is currently unable to perform the duties of an orthopedic surgeon,[5] and that he will remain unable to perform those duties for the rest of his life (Doc.

---

[3] Barnett objects to these letters on the basis of hearsay. (Doc. 49 ¶¶ 40-42.) Offered to prove the truth of the matters asserted therein, the letters themselves are inadmissible hearsay. See Fed. R. Evid. 801-803. While their contents "could be admitted into evidence at trial," Fraser, 342 F.3d at 1036, Lincoln makes no suggestion that an admissible form is anticipated (Doc. 56 at 6 ¶¶ 40-42). Therefore, Barnett's objection is sustained and the Court considers the letters only for their non-hearsay purposes.

[4] Barnett objects to this fact on the basis that it lacks evidentiary support. (Doc. 49 ¶ 43.) However, Lincoln need not disprove Barnett's case; rather, Lincoln may carry its burden by showing the absence of evidence for an element essential to Barnett's case.

[5] Having admitted that Barnett cannot perform the duties of a surgeon, (Doc. 59-12 at 6), Lincoln cannot now assert that Barnett is still able to perform many of the duties of a surgeon (Doc. 46 at 16 n. 4). See Fed. R. Civ. P. 36(a) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.").

1  54 ¶ 57). Lincoln stopped making disability payments once Barnett turned 65.

2  On September 12, 2012, Barnett filed suit in Maricopa County Superior Court
3  bringing claims for declaratory judgment, breach of contract, insurance bad faith, and
4  negligent misrepresentation. (Doc. 1-1 at 5-15.) Lincoln timely removed on the basis of
5  diversity (Doc. 1) and filed a Third-Party Complaint against Rogozinski, which was served
6  by publication. (Docs. 20; 27.) Rogozinski has not answered. Barnett and Lincoln jointly
7  moved to dismiss the insurance bad faith claim, which the Court granted. (Docs. 35; 36.)
8  Thereafter, Lincoln filed for summary judgment on all of Barnett's remaining claims.

## STANDARD OF REVIEW

10 "The court shall grant summary judgment if the movant shows that there is no genuine
11 dispute as to any material fact and the movant is entitled to judgment as a matter of law."
12 Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material[;] [o]nly
13 disputes over facts that might affect the outcome of the suit under the governing law will
14 properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477
15 U.S. 242, 248 (1986) "One of the principal purposes of the summary judgment rule is to
16 isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett,
17 477 U.S. 317, 323-24 (1986) (further citation omitted).

18 To prove the absence of a genuine dispute, the movant must demonstrate that "the
19 evidence is such that [no] reasonable jury could return a verdict for the nonmoving party."
20 Anderson, 477 U.S. at 248. "Where the non-moving party bears the burden of proof at trial,
21 the moving party need only prove that there is an absence of evidence to support the
22 non-moving party's case." In re Oracle Corp. Securities Litig., 627 F.3d 376, 388 (9th Cir.
23 2010). If the moving party carries that burden, then the non-moving party must designate
24 specific evidence capable of supporting a favorable verdict. Id.

25 In determining whether either or both of these burdens have been carried, "[t]he
26 evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn
27 in [that party's] favor." Anderson, 477 U.S. at 254; see Narayan v. EGL, Inc., 616 F.3d 895,
28 899 (9th Cir. 2010) (explaining an inference is justifiable if it is rational or reasonable).

1  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate
2  inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for
3  summary judgment." Anderson, 477 U.S. at 255.

4  "[D]istrict courts are widely acknowledged to possess the power to enter summary
5  judgments sua sponte, so long as the losing party was on notice that she had to come forward
6  with all of her evidence." Celotex, 477 U.S. at 326; see Fed. R. Civ. P. 56(f)(1). "Even when
7  there has been no cross-motion for summary judgment, a district court may enter summary
8  judgment sua sponte against a moving party if the losing party has had a 'full and fair
9  opportunity to ventilate the issues involved in the matter.' " Gospel Missions of Am. v. City
10 of Los Angeles, 328 F.3d 548, 553 (9th Cir. 2003) (quoting Cool Fuel, Inc. v. Connett, 685
11 F.2d 309, 312 (9th Cir. 1982)). Therefore, if an issue is fully and fairly ventilated by the
12 parties' summary judgment briefing and there is no evidence from which a jury could
13 reasonably decide that issue in the movant's favor, then summary judgment on that issue may
14 properly be granted against the movant.

15                                    **DISCUSSION**

16 Lincoln seeks summary judgment on all three of Barnett's remaining claims.

17 **I.   Breach of Contract & Declaratory Judgment**

18 There are three elements to a breach of contract claim: (1) the existence of a contract;
19 (2) breach; and (3) resultant damages. Thomas v. Montelucia Villas, LLC, 232 Ariz. 92, 96,
20 302 P.3d 617, 621 (2013). Only the breach element is disputed here. Breach is "a failure,
21 without legal excuse, to perform any promise which forms the whole or part of a contract."
22 Snow v. W. Sav. & Loan Ass'n, 152 Ariz. 27, 32, 730 P.2d 204, 210 (1986) (quoting 11
23 Williston on Contracts § 1290, at 2 (3d ed. 1968)). Whether a promise is part of a contract
24 depends on "the process by which [courts] determine the meaning of words in a contract."
25 Taylor v. State Farm Mut. Auto. Ins. Co., 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993).

26 At the heart of this case is the meaning of the operative clause in the Presumptive
27 Total Disability provision: "You will be presumed to have a Total Disability if Injuries or
28 Sickness results in the total loss of . . . the use of both hands." The parties disagree about the

meaning of "total loss." Lincoln proposes that "total loss" means the loss of "all practical benefit." (Doc. 47 at 18.) Barnett proposes that "total loss" means the "loss of use of his hands to perform the material and substantial duties" of his occupational specialty—orthopedic surgery. (Doc. 50 at 16.) The Policy itself is silent on the matter.

Much of the parties' briefing focuses on the existence and nature of CHUBB's relationship with Rogozinski. Rightly so: Barnett's claim for breach can be disposed of on agency grounds. Specifically, if Rogozinski was an agent of CHUBB with authority to make true representations about the effect of policy riders on coverage, then Rogozinski's representation about the effect of the Own Occupation Rider is binding on CHUBB, even if the representation turned out to be false. See Restatement (Third) of Agency § 6.11(3) (2006) [hereinafter "Restatement"]. Because there is no evidence from which a jury could reasonably conclude that Rogozinski lacked authority to make true representations about the effect of policy riders, and because Lincoln had a full and fair opportunity to ventilate its position regarding agency, the Court will grant summary judgment in favor of Barnett on his breach of contract and declaratory judgment claims.

Generally, the question of agency is one of fact, but the question becomes one of law when the material facts are undisputed. Ruesga v. Kindred Nursing Ctrs., L.L.C., 215 Ariz. 589, 595, 161 P.3d 1253, 1259 (App. 2007). It is undisputed that CHUBB executed a "General Agent's Contract" in which CHUBB expressly assented to Rogozinski taking legally significant actions on its behalf, including, *inter alia*, the sale and delivery of insurance policies. (Doc. 60-1 at 28-31.) Therefore, Rogozinski was an agent of CHUBB with express actual authority to perform those tasks.[6] See Restatement §§ 2.01, 3.01. Lincoln's assertion to the contrary, that "the contracts governing CHUBB's relationship with Rogozinski do not provide an actual agency" (Doc. 46 at 13), is incorrect as a matter of law.

---

[6] As a consequence, any information that Rogozinski learned in the ordinary course of selling and delivering insurance policies and that was material to the accomplishment of those objectives is imputed to CHUBB. Manley v. Ticor Title Ins. Co. of Cal., 168 Ariz. 568, 572, 816 P.2d 225, 229 (1991); accord Restatement §§ 5.03 to .04.

Actual authority extends beyond that expressly granted and includes the "implied" authority to (1) "do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities"; and/or (2) "act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Restatement § 2.01 cmt. b; accord Carrel v. Lux, 101 Ariz. 430, 440, 420 P.2d 564, 574 (1966) ("[A] power given an agent to perform a particular service carries with it the authority to do whatever is usual and necessary to carry into effect the principal power."); Ruesga, 215 Ariz. at 597, 161 P.3d at 1261 (quoting Restatement § 2.01 cmt. b).

Barnett argues that because Rogozinski explained how the insurance policy worked while he was selling and delivering the Policy, Rogozinski was acting within the implied scope of his express authority. (Doc. 50 at 9.) The unstated premise of this argument is that interpreting policy terms and riders is necessary to and in the usual course of selling insurance. Lincoln does not argue—nor is there evidence to suggest—that Rogozinski lacked implied actual authority to correctly explain insurance coverage.[7] However, Lincoln correctly points out that CHUBB expressly withheld the authority to "waive or alter" policy provisions in the agency contract (Doc. 60-1 at 29) and brought attention to the fact that agents could

---

[7] Lincoln's reply memorandum confuses implied authority with apparent authority: "Plaintiff argues that Rogozinski acted with implied authority; however, the evidence Plaintiff cites to in support of this argument is insufficient to rise to the level of apparent authority." (Doc. 55 at 3-4.) Lincoln proceeds to argue about apparent authority (id. at 4-5), but implied and apparent authority are distinct forms of agency. See Ruesga, 215 Ariz. at 598, 161 P.3d at 1262; Restatement §§ 2.02(1), .03.

Regardless, it is undisputed that Barnett believed Rogozinski had apparent authority to correctly explain coverage because: (1) Barnett knew Rogozinski was CHUBB's agent; (2) Barnett had previously purchased CHUBB instruments through Rogozinski; (3) CHUBB and Barnett communicated predominantly through Rogozinski; and (4) Rogozinski claimed interpretive authority. Based on the entire record, a jury could conclude only that Barnett's belief was reasonable and traceable to "expressive conduct," such as an indirect route of communication and conformity with prior transactions, see Restatement § 3.03 & cmt. b, especially since CHUBB ratified the transactions, see id. §§ 4.01, 5.03; see also Curran v. Indus. Commc'n of Ariz., 156 Ariz. 434, 437, 752 P.2d 523, 526 (App. 1988).

- 10 -

1 not waive or alter provisions in the application for insurance (Doc. 60-1 at 4). The premise underlying Lincoln's argument is that Rogozinski could not interpret policy provisions or riders so as to "alter" their meaning.

Both parties are correct. On the one hand, it would be all but impossible for Rogozinski to sell an insurance policy if he could not explain the coverage it provided, and neither the "General Agent's Contract" nor the insurance application make any mention of the agent's authority to explain the meaning of policy language. CHUBB could have withheld interpretive authority, but did not. There is no evidence capable of supporting a finding that Rogozinski lacked authority to correctly explain policy terms. On the other hand, Rogozinski's implied interpretive authority cannot conflict with clear and unambiguous policy language; such an interpretation would be tantamount to waiving or altering policy provisions. Both parties' positions are accommodated by framing the inquiry as whether Rogozinski's explanation of the Own Occupation Rider and the Presumptive Total Disability provision conflicts with the clear and unambiguous language of the Policy.

"The interpretation of an insurance contract is a question of law." Sparks v. Republic Nat'l Life Ins. Co., 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982) (further quotation omitted). If, "from the viewpoint of one not trained in law or in the insurance business," the policy language "can be reasonably construed in more than one sense, an ambiguity is said to exist." Id. Two important corollaries emerge from this legal principle: First, if there is only one reasonable construction for a layperson to reach, then any contrary construction alters the policy and is outside the scope of implied interpretive authority. Second, even if a term is ambiguous to a layperson, the agent's interpretation must nevertheless possess a reasonable basis in the policy language—the express reservation of authority to alter policy language is not obviated by ambiguous policy language. Hence, where policy language is ambiguous and the agent has authority to correctly explain the policy's meaning, the insurer is bound by an agent's reasonable interpretation of that language. See Restatement § 6.11(3); 3 Couch on Insurance § 50:8, at 50-15 (3d ed. 2011) ("Apart from legal principles, it is logical to conclude that there is greater justification both for the agent's interpretation and the insured's

- 11 -

1 reliance on that interpretation when the clause being interpreted is ambiguous.").

2 The Own Occupation Rider purports to "liberalize[] the policy definition of total
3 disability to create the best definition available today" by changing the definition of "Total
4 Disability or totally disabled" to mean the inability "to perform the substantial and material
5 duties of [his or her] occupation," provided the insured is receiving appropriate medical care
6 unless such care is futile. (Doc. 59-11 at 12.) The Presumptive Total Disability clause
7 references "Total Disability" three different times and states that the insured "will be
8 presumed to have a Total Disability if Injuries or Sickness results in the total loss of . . . the
9 use of both hands." (Id. at 4-5.)

10 It is undisputed that Barnett asked Rogozinski to explain the coverage resulting from
11 the interaction of the Own Occupation Rider and the Presumptive Total Disability provision.
12 It is also undisputed that Rogozinski explained the Own Occupation Rider modified the
13 Presumptive Total Disability provision so that Barnett would be presumed to be totally
14 disabled if he lost the use of both his hands to perform the substantial and material duties of
15 a practicing orthopedic surgeon. Further, it is undisputed that Barnett understood
16 Rogozinski's explanation as clarifying, as opposed to amending, the Policy. Nothing in the
17 Presumptive Total Disability provision plainly states that the definition of "total loss" is
18 independent of the Own Occupation Rider and there is no evidence to suggest that Barnett
19 knew or had reason to know Rogozinski's explanation was incorrect. The Court finds as a
20 matter of contract interpretation that Barnett could have reasonably interpreted the "total
21 loss" clause in more than one way and that Rogozinski's construction of the Own Occupation
22 Rider *vis-à-vis* the Presumptive Total Disability provision was reasonable.

23 Given that Rogozinski had authority to correctly explain CHUBB's lines of coverage
24 and that his explanation of Barnett's coverage does not conflict with plain and unambiguous
25 language, Rogozinski's explanation is binding on CHUBB and its successors. This result is
26 consistent with the well settled common law principle that the acts of the agent in the
27 ordinary course of service to the principal are the acts of the principal. See Queiroz v.
28 Harvey, 220 Ariz. 273, 275, 205 P.3d 1120, 1122 (2009). Therefore, Barnett is entitled to

lifetime total disability benefits if, before his 65th birthday, he lost the use of both his hands to perform the substantial and material duties of a surgeon.

The only evidence in the record is that Barnett indeed lost the use of both his hands for purposes of surgery before his 65th birthday. It is undisputed that CHUBB and its successors initially paid out benefits because Barnett lost the ability to perform surgery. It is also undisputed that Barnett, before his 65th Birthday, communicated to Lincoln that he had lost the use of both hands to perform surgery. It is undisputed that Barnett cannot now perform the duties of an orthopedic surgeon and that he will never regain the ability to perform those duties. There is no evidence capable of supporting a finding that Barnett did not lose the use of both hands to perform the substantial and material duties of surgery before his 65th birthday. Consequently, Lincoln's refusal to pay benefits past Barnett's 65th birthday breached the Policy and Barnett is entitled to summary judgment on both his claims for breach and for declaratory judgment.

It is true that this result is based principally upon Barnett's own recollection, but that does not mean that Lincoln is excused from having to come forward with evidence from which a jury could return a favorable verdict. Lincoln "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Despite having a full and fair opportunity to ventilate the dispositive issues, Lincoln fails to come forward with any evidence, let alone significantly probative evidence, that Rogozinski lacked authority to correctly explain policy coverage; that Rogozinski did not tell Barnett that he would be presumed totally disabled if he lost the use of both his hands for purposes of surgery; that Barnett had reason to know that Rogozinski's explanation was an alteration of Policy terms; or that Barnett did not lose the ability to use his hands for surgery until after his 65th birthday. As there is no genuine dispute about the forgoing issues, there is therefore no reason to submit any of them to a jury.

**II.     Negligent Misrepresentation**

In Arizona, there is a two-year statute of limitations for negligent misrepresentation actions. Hullett v. Cousin, 204 Ariz. 292, 297, 63 P.3d 1029, 1034 (2003). Generally, the

1 limitations period begins to run when the cause of action accrues. Gust, Rosenfeld &
2 Henderson v. Prudential Ins. Co. of Am., 182 Ariz. 586, 588, 898 P.2d 964, 966 (1995). Like
3 other negligent torts, a cause of action for negligent misrepresentation "accrues when the
4 plaintiff knows, or in the exercise of reasonable diligence should have known, of the
5 defendant's negligent conduct, or when the plaintiff is first able to sue." Sato v. Van
6 Denburgh, 123 Ariz. 225, 227, 599 P.2d 181, 183 (1979) (citations omitted). "While an
7 injured person 'need not know all the facts underlying a cause of action to trigger accrual .
8 . . [,] the plaintiff must at least possess a minimum requisite of *knowledge sufficient to*
9 *identify that a wrong occurred and caused injury.*'" Walk v. Ring, 202 Ariz. 310, 316, 44
10 P.3d 990, 996 (2002) (quoting Doe v. Roe, 191 Ariz. 313, 323, 955 P.2d 951, 961 (1998)).
11 "[D]eterminations of the time when discovery occurs and a cause of action accrues 'are
12 usually and necessarily questions of fact for the jury.'" Id. (quoting Doe, 191 Ariz. at 323,
13 955 P.2d at 961).

14 In the case at bar, Barnett may have had reason to believe that Rogozinski
15 misrepresented the Policy terms by August 8, 2008, when a Lincoln Representative told
16 Barnett that his benefits were set to expire on his 65th birthday. (Doc. 60-1 at 69-70.)
17 However, after Barnett hired an attorney, Lincoln sent five letters requesting proof that
18 Barnett lost the use of both his hands (Docs. 60-2 at 48-49, 51, 53; 60-3 at 2-3, 5-6), but
19 Barnett had already submitted what he believed to be sufficient proof of loss (Doc. 54 ¶¶ 61-
20 62). On the one hand, Barnett could have known injury was imminent if the Policy definition
21 was what Lincoln said it was. On the other hand, Barnett may have believed—at least until
22 benefit payments ceased—that Lincoln retreated from its August 8, 2008, interpretation and
23 that Rogozinski may not have misrepresented the terms of the Policy. The evidence in the
24 record permits inferences for both parties' positions on the matter of when Barnett discovered
25 the negligent misrepresentation cause of action. It is therefore for the jury to "determine at
26 what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided
27 sufficient facts to constitute a cause of action." Walk, 202 Ariz. at 316, 44 P.3d at 996
28 (quoting Doe, 191 Ariz. at 324, 955 P.2d at 962).

Accordingly,

**IT IS HEREBY ORDERED** withdrawing the portion of the Court's Order of January 23, 2014, striking Barnett's controverting statement of facts. (Doc. 52 at 2:6-7, 12-14.)

**IT IS FURTHER ORDERED denying** Lincoln's Motion for Summary Judgment. (Doc. 46.)

**IT IS FURTHER ORDERED granting** Barnett summary judgment on his declaratory judgment and breach of contract claims.

**IT IS FURTHER ORDERED** that the Final Pretrial Conference shall be set in a subsequent order.

DATED this 27th day of August, 2014.

Stephen M. McNamee
Senior United States District Judge